IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MCKINNEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTOPHER MCKINNEY, APPELLANT.

Filed February 13, 2024.    No. A-23-503.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed.

Trevin H. Preble, of Preble Law Firm, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Christopher McKinney pled no contest to one count of terroristic threats. The Otoe County District Court sentenced him to 360 days in jail followed by 18 months of post-release supervision. McKinney claims his sentence is excessive and that his trial counsel was ineffective. We affirm.

## BACKGROUND

On May 13, 2022, the State filed an information charging McKinney with three counts: count I, terroristic threats, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-311.01 (Reissue 2016); count II, use of a deadly weapon to commit a felony, a Class II felony, pursuant to Neb. Rev. Stat. § 28-1205(1)(b) (Reissue 2016); and count III, third degree domestic assault, first offense, a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-323 (Reissue 2016).

Subsequent amendments were made to the information, and on April 3, 2023, the State filed a third amended information charging McKinney with three counts: counts I and II, terroristic

threats, a Class IIIA felony, pursuant to § 28-311.01; and count III, use of a deadly weapon to commit a felony (firearm), a Class IC felony, pursuant to § 28-1205(1)(c).

On April 17, 2023, pursuant to a plea agreement, McKinney pled no contest to count I of the third amended information (terroristic threats) and the State moved to dismiss counts II and III. For the factual basis, the State offered the "Affidavit in Support of Arrest Warrant authored by Christopher Bando from the Otoe County Sheriff's Office and dated January 12th, 2022"; it was received without objection. The affidavit stated in relevant part:

3. On January 12, 2022, at approximately 3:00 a.m. Deputy Dylan Lazure and Deputy Richard Shea were called to [an address in] Palmyra, Otoe County, Nebraska for a domestic disturbance.

4. When they arrived on scene they had contact with [K.H.].

5. [K.H.] resides at [the address] with Chris McKinney.

6. [K.H.] and Chris McKinney are domestic partners.

7. [K.H.] stated that she and McKinney began fighting earlier in the evening after a Couple's Counseling Session went bad.

8. McKinney made several threats to hurt himself.

9. McKinney put a pocket knife to his throat and made a wiping motion across his neck.

10. McKinney took a shotgun and pointed it to his face.

11. [K.H.] then called law enforcement.

12. Officers arrived on the scene and entered the residence.

13. After law enforcement arrived, McKinney ran[] to the basement of his home.

14. Officers Lazure and Shea attempted to go into the basement from the interior of the home to speak to McKinney.

15. McKinney then pointed a shotgun at the officers and McKinney told officers if anyone attempted to enter the home through the exterior basement door he would "Blow them Away."

16. McKinney was also heard to ask if the officers had trauma plates and what kind of vests were they wearing.

17. McKinney indicated to [K.H.] that he had transferred all their finances into her name.

18. McKinney told [K.H.] that he was worth more dead than alive.

19. McKinney has marks on his arms from previous suicide attempts.

20. [K.H.] said the basement is an arsenal and there are various guns found through out [sic] the home.

21. There is a camper parked in the driveway of the [home] and there may be weapons in the drive.

22. McKinney was last seen in the home, however he could get into the camper on the driveway and for safety we would request the ability to search the camper in approach.

23. Deputies and member [sic] of Nebraska State Patrol are on the scene and are attempting to negotiate with Mr. McKinney.

24. That it is necessary to preserve the evidence of this crime and for the protection of the public to execute this warrant at any time of the day.

25. That I am requesting this search warrant to seize the following:
a. Chris McKinney
b. Ammunition
c. Weapons.

The district court accepted McKinney's plea of no contest to count I, terroristic threats, and found him guilty of the same. The court further granted the State's motion to dismiss counts II and III of the third amended information. The case was set for sentencing.

At the sentencing hearing on June 5, 2023, the district court sentenced McKinney to 360 days in jail followed by 18 months of post-release supervision. McKinney was given credit for 3 days' time served. His subsequent motion for house arrest was denied.

McKinney appeals.

## ASSIGNMENTS OF ERROR

McKinney assigns that (1) the sentence imposed by the district court was excessive and (2) he was denied his right to effective assistance of counsel because trial counsel failed to move to suppress "the arrest warrant that was issued."

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## ANALYSIS

### EXCESSIVE SENTENCE

McKinney claims that the sentence imposed by the district court was excessive and constitutes an abuse of discretion, and he argues that he should have been placed on probation. McKinney was convicted of one count of terroristic threats, a Class IIIA felony, which is punishable by up to 3 years' imprisonment and 18 months' post-release supervision, a $10,000 fine, or both. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022). The court sentenced McKinney to 360 days in jail followed by 18 months of post-release supervision; the sentence was within the statutory range. As such, we review the court's sentencing determination only for an abuse of discretion.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment

and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

McKinney was 42 years old at the time of sentencing. According to the presentence report (PSR), he was divorced and had one living child. McKinney was currently engaged to K.H., and they "have been together for 13 years." He has an associate's degree in electrical engineering and had been working in sales at an auto dealership.

We will not recount McKinney's juvenile history, but his adult criminal history includes fines for "[n]o valid registration" and "[n]o proof of insurance" in 2001, speeding in 2020, and "[h]unt/poss game birds/animals without permit" and "[v]iolate traffic regulations within parks" in 2021. The details of his current offenses have been set forth previously.

The probation officer conducted a "Level of Service/Case Management Inventory." McKinney was assessed as a medium high risk to reoffend. He scored as a high risk in the criminogenic risk factor domain for alcohol/drug problems; a medium risk in the domains for criminal history, leisure/recreation, and companions; a low risk in the domains for family/marital, procriminal attitude, and antisocial pattern; and a very low risk in the domain for education/employment. Due to the nature of the offense, a specific assessment for domestic violence was completed and McKinney was placed at the high-risk level for specialized community supervision "because he made threats to seriously harm or kill his victim and he had loaded weapons with him at the time."

The probation officer noted that "McKinney believes that the government is corrupt and that he needs his weapons to protect himself and his family from the government"; "[h]e is very anti-government which could cause supervision problems." In the event the district court found McKinney to be a suitable candidate for a term of supervised probation, the probation officer recommended that McKinney be required to successfully complete (1) a substance use dependency evaluation and follow all recommendations, (2) a mental health evaluation and follow all recommendations, and (3) "BIP."

At the sentencing hearing, McKinney's counsel argued that it was important to "sentence not only the offense but the offender." Counsel pointed out that McKinney had done "a number of things to mitigate his risk both to himself and to the larger community since he was arrested," specifically completing treatment and wearing a "cam monitor." Counsel stated that "based on [McKinney's] lack of prior criminal history, it certainly seems to be an out-of-character set of circumstances." "I think it would be fair to say that this incident with law enforcement involved both some depression issues related to suicidal ideation and alcohol which I think exacerbated the decision-making in this case." Counsel "suggest[ed]" that it would be more appropriate to place McKinney "on a period of probation for the maximum term of five years than warehousing him in a Department of Corrections facility or the county jail for a much shorter period of time followed by a much shorter period of post-release supervision."

McKinney personally addressed the district court stating:

> I recognize that the officers were there that night to assist me at this point. However, when they entered my home, they did so with their weapons drawn, and the first thing I recognized is an officer in the home, was a gun barrel poking in the door . . . in the room I was at. That represented a threat to me and changed my mindset. I asked them if they had a warrant. They replied they did not. I asked them to leave.

I never pointed a gun at an officer not once during the entire time there. That's evidenced by the body cam video. When the officers left, I was actually walking upstairs . . . because I . . . was sobering up enough to figure out that they weren't going to leave without me talking to them. I walked upstairs to talk to them. I was in possession of a weapon. I still would not point it at anyone.

At the time I was a legal firearm owner. I had never been ordered to drop that weapon.

When I got upstairs, I looked for the officers to the point where I walked out the door, looked around, didn't see them. And then I went to bed. I woke up the next morning late for work and let my dogs out and then saw a whole bunch of guns pointing at my home.

My question through the negotiation was, "What's going on? Send somebody up here to talk to me." They refused. I wasn't comfortable walking out toward 40 guns. It wasn't a question of whether I was combative or threatening anyone. It was tell me what's going on, because to my knowledge, I had never been arrested the night before. . . . And when I finally got somebody to tell me what I was going to be charged with, it was a domestic violence thing . . . which didn't happen in the first place.

So this has severely impacted my life. I have done everything I can to . . . make the requisite changes, and I'm here to get this finished and over with.

The State argued that McKinney was not a suitable candidate for probation. It stated that officers arrived at McKinney's home to help him because there were concerns that he was attempting suicide. Officers spoke with McKinney and for 45 minutes he "threatened the officers at gunpoint"; "[h]e had guns in his hand during the entire time" and "was waiving those around." McKinney told the officers that he was going to shoot them and asked about their body armor. Officers retreated from the home about 4:15 a.m. There were several hours with no activity in the home, and then at 10:30 a.m. McKinney walked outside to let his dogs out, saw that his house was surrounded by the SWAT team, and then continued to be combative and continued to make threats. The State said, "It took the [SWAT team] tank" arriving to get McKinney out of his home before McKinney "relinquished," and "he didn't do that until approximately 12:45 p.m."

The district court asked McKinney if he remembered saying anything to the law enforcement officers about their body armor. McKinney replied, "I do," "[b]ut . . . we were talking at that point and . . . I had asked the officers to leave because . . . without having a warrant and without having ordered me to drop my weapons or telling me I was under arrest, they were in my home . . . and shouldn't have been." He said, "If I was given any options that night . . . other than put your gun down and walk towards ours, there would have been a much different outcome, but as it was, the statement was . . . we're just here to talk"; "Well, I don't want to talk to you," "[p]ut your guns down and then we can talk." According to McKinney, once law enforcement told him what was going on, he "surrendered peacefully." A few days later, he asked the people at the jail to get him some help because he was having more suicidal ideations, and he was transferred out of the jail and into the Mental Health Crisis Center.

The district court stated that it had reviewed the PSR and listened to the comments of the attorneys and McKinney in the courtroom. The court said, "I'm just trying to wrap my head around what happened, because when I look at your [PSR], mostly you've had a good and law-abiding

life," "[y]ou have an associate's degree," and "[y]ou have a good job with a good salary"; "I'm not seeing . . . at least as an adult, any violent offenses, any felonies, anything that would suggest that something like this might happen." "[I]t does seem like you were experiencing some kind of a crisis," "I don't know if you were trying to kill yourself." "You were intoxicated." "You have a very limited criminal history, nothing like this whatsoever in the past." "But this is an extremely serious offense," and "[f]rankly, you're fortunate that you survived this, because getting into, essentially, an armed standoff with law enforcement officers is dangerous, both for the law enforcement officers and for the suspect." The court also said that it sounded like McKinney was trying to blame the law enforcement officers.

The district court noted that McKinney was previously charged in this case with the use of a firearm during the commission of a felony which carried a mandatory minimum sentence, but that was dismissed as part of the plea agreement "so it's possible to sentence you to probation on this case." "But this was a standoff involving firearms that required a SWAT team and a tank, and I just think that if I give you probation that will depreciate the serious nature of what occurred or promote a disrespect for the law." The court explained to McKinney that by giving him a jail sentence rather than a prison sentence, McKinney would have the opportunity to apply for work release. It then sentenced McKinney as previously set forth.

In his brief on appeal, McKinney claims the district court abused its discretion by imposing a sentence of incarceration rather than placing him on probation. McKinney refers to Neb. Rev. Stat. § 29-2260(3) (Reissue 2016), which sets out various factors which "shall be accorded weight in favor of withholding [a] sentence of imprisonment" by a sentencing court. He argues that the court failed to give adequate weight to the majority of factors that weighed in favor of giving him probation, and that "[t]here was no reason that incarceration was necessary for any reason other than the Court believing that a different sentence would depreciate the seriousness of the offense and promote disrespect for the law." Brief for appellant at 8.

Having considered the relevant factors in this case, we cannot say that the district court abused its discretion when it sentenced McKinney to jail rather than probation. See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court).

INEFFECTIVE ASSISTANCE OF COUNSEL

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id.*

McKinney had an initial trial attorney through the entry of his plea, followed by a different trial attorney who appeared on his behalf for sentencing only. On appeal to this court, McKinney has new appellate counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman, supra*. Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to

establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Lierman, supra*. Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Blaha, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id.* The two prongs of the ineffective assistance of counsel test under *Strickland* may be addressed in either order. *State v. Blaha, supra*.

McKinney assigns and argues that trial counsel was deficient for failing to move to suppress the arrest warrant that was issued, thereby denying his right to effective assistance of counsel. He specifically argues that the arrest warrant lacked probable cause for his arrest.

At the plea hearing, the district court advised McKinney that if he pled guilty or no contest, that he would not have a trial and he would be "giving up [his] right to have a hearing on any pretrial motions and to appeal any adverse ruling on pretrial motions." McKinney confirmed that he understood. He also confirmed that it was his intention to give up that right (and others) and enter into the plea agreement. Regardless of his trial counsel's actions, it appears McKinney cannot establish that he would have insisted on going to trial when he personally informed the court that he was willing to give up his right to a hearing on any pretrial motions and enter into the plea agreement. Therefore, McKinney would not be able to establish prejudice.

Further, trial counsel's failure to file a motion to suppress the arrest warrant was not deficient. Although no arrest warrant appears in our record, Deputy Sheriff Bando's report appearing in the PSR states that one was issued; Deputy Bando's "Affidavit in Support of Arrest Warrant" was the factual basis for McKinney's plea. Where an arrest is pursuant to a warrant the validity of the arrest turns on whether the county court had probable cause to issue the arrest warrant. *State v. Wenke*, 276 Neb. 901, 758 N.W.2d 405 (2008). Generally, in determining whether probable cause exists for the issuance of an arrest warrant, the issuing magistrate is to make a commonsense decision whether, given the totality of the circumstances set forth in the affidavit before him or her, including the veracity and basis of knowledge of the persons supplying the hearsay information, there is a fair probability the defendant was implicated in the crime. *State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000).

McKinney claims that the warrant was "facially deficient" and "should have been suppressed" because the alleged acts happened in his home, he never invited law enforcement into his home, he told law enforcement to leave his home, and law enforcement had no right to be in

his home. Brief for appellant at 9. However, the State claims the affidavit set forth evidence that there was a fair probability McKinney was implicated in the crime. We agree with the State.

Deputy Bando's affidavit in support of the arrest warrant showed that law enforcement officers were called to McKinney's home for a domestic disturbance at approximately 3 a.m. When they arrived, they had contact with K.H. who resided in the home with McKinney. Law enforcement learned that McKinney had made several threats to hurt himself, put a pocketknife to his throat and made a wiping motion across his neck, and took a shotgun and pointed it at his face. When officers attempted to enter the residence to speak with McKinney, McKinney pointed a shotgun at them and told them if anyone attempted to enter the home he would "Blow them Away"; he also asked about their body armor and vests. Law enforcement learned from K.H. that the basement was "an arsenal" and there were various guns throughout the home. The affidavit, which was filed at 10:25 a.m. that same day, stated that law enforcement was on the scene and attempting to negotiate with McKinney. Given the totality of the circumstances set forth in the affidavit, there was a fair probability the defendant was implicated in the crime; therefore, probable cause existed for the issuance of the arrest warrant. See *State v. Davidson, supra*. Accordingly, trial counsel's failure to file a motion to suppress the arrest warrant was not deficient and this claim of ineffective assistance of counsel fails.

We note that in the argument section of his brief, McKinney also states that trial counsel was deficient for failing to move to suppress "the [s]earch [w]arrant." Brief for appellant at 8. McKinney did not specifically assign error regarding counsel's failure to move to suppress the search warrant. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Clark*, 315 Neb. 736, ___ N.W.2d ___ (2024).

## CONCLUSION

For the reasons set forth above, we affirm McKinney's conviction and sentence, and we conclude that his claim of ineffective assistance of trial counsel fails.

AFFIRMED.